```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                        MARSHALL DIVISION

 4  TEXTRON INNOVATIONS, INC.,   )(

 5       PLAINTIFF,              )(    CIVIL ACTION NO.

 6                               )(    2:22-CV-351-RWS-RSP

 7  VS.                          )(    MARSHALL, TEXAS

 8  SZ DJI TECHNOLOGY CO., LTD., )(

 9  DJI EUROPE B.V., SZ DJI      )(

10  BAIWANG TECHNOLOGY CO. LTD., )(    JULY 24, 2023

11  AND IFLIGHT TECHNOLOGY       )(    1:32 P.M.

12  COMPANY LTD.,                )(

13       DEFENDANTS.             )(
```

                         MOTION HEARING

                 BEFORE THE HONORABLE ROY S. PAYNE

                 UNITED STATES MAGISTRATE JUDGE

```
17  FOR THE PLAINTIFF:      Mr. Kevin J. Meek
                            McDermott Will & Emery, LLP
18                          303 Colorado Street
                            Suite 2200
19                          Austin, TX 78701

20  COURT REPORTER:         Ms. Shelly Holmes, CSR, TCRR
                            Official Court Reporter
21                          Honorable Robert W. Schroeder III
                            United States District Judge
22                          Eastern District of Texas
                            Texarkana Division
23                          500 North State Line Avenue
                            Texarkana, TX 75501
24                          shelly_holmes@txed.uscourts.gov

25  (Proceedings recorded by mechanical stenography, transcript
    produced on a CAT system.)
```

```
 1   FOR THE PLAINTIFF:      Mr. Harrison G. Rich
                             Baker Botts, LLP
 2                           2001 Ross Avenue
                             Suite 900
 3                           Dallas, TX 75201

 4                           Mr. J. Travis Underwood
                             Gillam & Smith, LLP
 5                           102 N. College
                             Suite 800
 6                           Tyler, TX 75702

 7   FOR THE DEFENDANTS:     Ms. Catherine Nyarady
                             Mr. Kripa A. Raman
 8                           Paul Weiss Rifkind Wharton &
                             Garrison
 9                           1285 Avenue of the Americas
                             New York City, NY 10019
10
                             Mr. Andy Tindel
11                           Mann, Tindel & Thompson
                             112 E. Line
12                           Suite 304
                             Tyler, TX 75702
13
14
15
16
17
18
19
20
21
22
23
24
25
```

01:22:09
01:22:09
01:32:06

01:32:06  1          COURT SECURITY OFFICER:  All rise.

01:32:08  2          THE COURT:  Good afternoon.  Please be seated.

01:32:24  3          For the record, we're here for the motion hearing

01:32:30  4  in SZ DJI -- let me see, I'm sorry, Textron Innovations

01:32:40  5  versus SZ DJI Technology, which is Case No. 2:22-351 on our

01:32:46  6  docket.

01:32:47  7          Would counsel state their appearances for the

01:32:48  8  record?

01:32:49  9          MR. UNDERWOOD:  Good afternoon, Your Honor.

01:32:53  10  Travis Underwood on behalf of the Plaintiff, Textron

01:32:56  11  Innovations.  I'm joined by our lead counsel, Mr. Kevin

01:32:59  12  Meek, and I'm also joined by Mr. Harrison Rich.  Mr. Rich

01:33:02  13  will be presenting argument on our behalf this afternoon.

01:33:06  14  And we're ready to proceed.

01:33:06  15          THE COURT:  All right.  Thank you, Mr. Underwood.

01:33:15  16          MR. TINDEL:  Good afternoon, Your Honor.  Andy

01:33:22  17  Tindel.  I'm here with our lead counsel, Catherine

01:33:26  18  Nyarady --

01:33:26  19          MS. NYARADY:  Good afternoon, Your Honor.

01:33:28  20          MR. TINDEL:  -- and Kripa Raman.

01:33:30  21          MR. RAMAN:  Good afternoon.

01:33:31  22          MR. TINDEL:  They're from the Paul Weiss firm.

01:33:34  23  And we're here on behalf of all the DJI-related Defendants.

01:33:37  24  And we're ready to proceed.

01:33:39  25          THE COURT:  Thank you, Mr. Tindel.

01:33:40  1          All right.  Since we're here on the Defendants'

01:33:43  2    motion for protective order, I'll hear first from counsel

01:33:46  3    for Defendant.

01:33:51  4          MS. NYARADY:  Thank you, Your Honor.

01:33:52  5          So we're here today on a motion under Rule 26(c)

01:33:59  6    seeking a protective order against the production of a

01:34:02  7    limited amount of source code in this case.  There's no

01:34:06  8    dispute on some of the facts in question, the code resides

01:34:11  9    in China.  The code in question, the restricted code as

01:34:15  10   we'll call it, is subject to export controls.  It's a

01:34:19  11   restricted technology under Chinese law.  And the Chinese

01:34:24  12   law calls for criminal and civil penalties should the

01:34:28  13   Defendants export that restricted code.

01:34:30  14          THE COURT:  How was it decided that a certain

01:34:33  15   portion of the code is subject to that restriction?

01:34:36  16          MS. NYARADY:  So there was an application --

01:34:39  17   there's actually more than one application now that were

01:34:42  18   filed with the government in China to export the code, and

01:34:47  19   as part of that process -- and this is set forth in the

01:34:50  20   Ren declaration that we submitted with our opening brief.

01:34:54  21   As part of that process, there is a committee that our

01:34:58  22   technical advisors, as I understand it, which is Phase 1 of

01:35:02  23   the process, where they determine whether or not the code

01:35:05  24   falls within the statute sections.

01:35:07  25          THE COURT:  And the Plaintiff maintains in their

01:35:09  1   brief that DJI did not advise the Chinese authorities about

01:35:22  2   the protections that are provided by the Court's standard

01:35:24  3   protective order.

01:35:26  4        What do you say to that?

01:35:27  5        MS. NYARADY:  That is not accurate, Your Honor.

01:35:28  6   The protective order -- well, let me -- let me split it up

01:35:33  7   because I don't want to misstate.

01:35:34  8        In the first application that was filed back in

01:35:37  9   2022, it's my understanding that the protective order in

01:35:44  10  the Western District case, that was Case I, and there was

01:35:48  11  no protective order in this case, but my understanding is

01:35:52  12  that no protective order was submitted with the first

01:35:53  13  application.

01:35:54  14       With the second application and in response to a

01:35:57  15  number of criticisms that Textron levied against DJI with

01:36:01  16  respect to the first application, in the second

01:36:03  17  application, the protective order was specifically called

01:36:06  18  out, and then the final version of that order was submitted

01:36:11  19  to the authorities in China prior to the decision denying

01:36:15  20  the export.

01:36:21  21       THE COURT:  And there are a couple of other

01:36:23  22  criticisms that Textron makes, such as saying that Textron

01:36:29  23  was in the defense industry and that it would be the

01:36:33  24  importer of the source code?

01:36:37  25       MS. NYARADY:  Correct.  Which, again, those were

01:36:40  1  criticisms made against the first application.  They were

01:36:46  2  remedied in the second application.  We specifically

01:36:52  3  clarified -- and suppose we, it's DJI who filed the

01:36:54  4  application specifically clarified who was doing the

01:36:57  5  importing.

01:36:58  6       Again, we told them about the protective order.

01:36:59  7  That was another criticism that Textron had made.  We made

01:37:03  8  it clear who would be receiving the code.  There was a

01:37:06  9  criticism from Textron on the first application that we did

01:37:10  10  not make it clear that no -- who was going to be receiving

01:37:14  11  it, and the application could have been read, as I take

01:37:17  12  Textron's brief, to say that some individuals inside of

01:37:21  13  Textron would receive the information.

01:37:24  14       So, again, that was clarified, and then the

01:37:27  15  protective order was submitted that makes it clear who has

01:37:29  16  access to the source code.

01:37:32  17       There was also another criticism that was made

01:37:35  18  that we made the source code sound too important in the

01:37:38  19  first application.  So in the second application, we

01:37:42  20  removed a lot of the language about the source code and the

01:37:45  21  relevance.  Of course, now, we're being criticized for

01:37:49  22  having removed that language, but that was in response to a

01:37:52  23  criticism from Textron.

01:37:53  24       Now, I think, Your Honor, a lot of these

01:37:55  25  criticisms come up in the briefing in the analysis of good

01:37:58    1   faith.  And I think it's important to understand not only

01:38:02    2   did we file two applications to date already, but in the

01:38:07    3   second application, we attempted to address all of the

01:38:09    4   criticisms that were made by Textron.

01:38:11    5        We asked the Plaintiff -- we asked Textron to be

01:38:15    6   involved with that second application.  We offered to work

01:38:18    7   jointly with Textron to be -- to file an application if

01:38:23    8   they had ideas that they thought would help make the code

01:38:28    9   be produced.

01:38:29   10        They've stated during the meet and confer that

01:38:30   11   they have Chinese counsel that they've consulted with, and

01:38:33   12   so we would welcome any thoughts that they have.  They

01:38:35   13   refused.  They wanted nothing to do with this application

01:38:38   14   process because it's easier for them to criticize whatever

01:38:42   15   we do than to help us actually try to produce the code.

01:38:45   16        And let me be clear, DJI wants to produce this

01:38:47   17   code.  We are willing to file another application.  We're

01:38:52   18   willing to work with Textron on that application if there

01:38:55   19   are further things that they think we can change that would

01:38:59   20   increase the odds of it being allowed for export.

01:39:02   21        We also -- once Textron didn't want to jointly

01:39:06   22   draft anything, we drafted an application.  On the meet and

01:39:11   23   confer that we had almost immediately after my firm entered

01:39:14   24   the case, Your Honor, I was on a call where we offered to

01:39:17   25   show them the application so they could comment on it.

01:39:19  1  They wanted -- they expressed that they wanted nothing to
01:39:23  2  do with the application process.
01:39:27  3       What's really bubbling to the surface, Your Honor,
01:39:29  4  is that they actually don't want the source code.  What
01:39:31  5  they want is an adverse inference.  What they want is for
01:39:36  6  DJI not to be able to produce the source code, they can get
01:39:39  7  an adverse inference, and they can avoid having to make
01:39:42  8  proofs in the case.
01:39:44  9       THE COURT:  They contend in brief that DJI had an
01:39:49  10  opportunity to appeal after the initial rejection and did
01:39:54  11  not do so.  Is that correct?
01:39:56  12       MS. NYARADY:  That is my understanding.  My
01:39:59  13  understanding from counsel in China is that no one has ever
01:40:04  14  appealed one of these orders in China, and the standard of
01:40:07  15  review is so high when it comes to national security
01:40:11  16  that -- that that was not done.
01:40:14  17       We are willing to do that.  We are still within
01:40:17  18  the window to do that on the second application.  We're not
01:40:22  19  sure that that makes the most sense versus perhaps filing
01:40:25  20  another application if we can, again, amend what we're
01:40:30  21  asking for.  But we're willing to file an appeal on the
01:40:34  22  second application.  Again, DJI wants to produce this
01:40:38  23  source code.  So we will take every step that we can to do
01:40:41  24  so.
01:40:41  25       THE COURT:  One of the things that the Plaintiff

01:40:44   1   represents in brief is that this regulation has been in

01:40:49   2   place since at least 2008 and has been in its current form

01:40:56   3   since at least 2020.

01:40:59   4          Why am I not seeing other Chinese Defendants

01:41:03   5   raising this same issue?

01:41:05   6          MS. NYARADY:  I don't know whether other Chinese

01:41:09   7   Defendants have source code and the types of products that

01:41:12   8   are at issue would rise to the level of national security,

01:41:15   9   Your Honor.

01:41:15   10         You know, this is flight control data.  It can be

01:41:18   11   used for military purposes.  I'm guessing.  I don't know

01:41:22   12   the answer to that.

01:41:23   13         I also don't know -- you know, it was pointed out

01:41:27   14   in the briefing that there's been no indication or -- that

01:41:33   15   China has thrown people in jail, you know, for violating

01:41:36   16   these denial of export licenses.  I'm also not aware of any

01:41:42   17   company that has taken the brazen step of ignoring such an

01:41:45   18   order and producing source code in U.S. litigation.

01:41:49   19         And it seems to DJI that producing the source code

01:41:51   20   against two now directives when the Chinese government to

01:41:56   21   see if someone gets thrown in jail, you know, does not seem

01:42:00   22   like the right approach here.

01:42:01   23         THE COURT:  You know, if your motion is granted,

01:42:03   24   that basically just means you can stop trying.

01:42:07   25         Why should the Court grant that?

01:42:09  1        MS. NYARADY:  We are happy to keep trying, Your

01:42:12  2   Honor.  I mean, that could be part of the order.  We are

01:42:15  3   happy to keep taking steps, again, to submit another

01:42:18  4   application or to appeal this.

01:42:20  5        But we wanted to get in front of this Court to

01:42:25  6   make the Court aware of the issue, to make the Court aware

01:42:27  7   of the Defendants' efforts in this regard so that we don't

01:42:32  8   end up where -- you know, quite frankly where Plaintiffs

01:42:36  9   want to end up, which is a Rule 37 motion at some point

01:42:41 10   alleging that there should be an adverse inference because

01:42:44 11   of the failure to produce the source code.

01:42:46 12        But let me be clear, I do not see a protective

01:42:49 13   order issuance as permission to stop.  And, in fact, when

01:42:54 14   we briefed this motion, you know, we said unless or until

01:42:57 15   permission is granted by the Chinese government.

01:43:01 16        So I will represent to the Court that we will

01:43:04 17   have -- DJI will keep trying to produce this source code.

01:43:06 18   We're happy to submit evidence of that to the Court on an

01:43:09 19   ongoing basis and update the Court periodically.

01:43:12 20        But the situation we find ourselves in right now

01:43:15 21   is that the deadline for producing source code came, and we

01:43:21 22   knew that there was a certain amount of source code that we

01:43:24 23   legally could not produce.  And that is why we came to the

01:43:28 24   Court.

01:43:29 25        THE COURT:  You make the representation in your

01:43:32  1   briefs that it's an insubstantial amount of source code.

01:43:37  2   But what I see from the Plaintiffs is that the source code

01:43:41  3   modules that have been withheld appear, at least by title,

01:43:48  4   to go to the heart of their patents.

01:43:58  5          MS. NYARADY:  Your Honor, the briefing by Textron

01:44:00  6   really addresses relevance.  It doesn't address necessity

01:44:03  7   or need.

01:44:04  8          And the question that I keep coming back to is

01:44:08  9   what part of their infringement case can only be shown by

01:44:12  10  the source code to the point where, you know, they can't

01:44:15  11  make their case without it?  I don't think there is any

01:44:19  12  such claim element that can't be shown by the source code,

01:44:23  13  and they've identified none.

01:44:24  14         And, in fact, Your Honor, as Your Honor knows,

01:44:26  15  there's a discovery order in this case that controls that

01:44:31  16  says that if a party is claiming patent infringement, if

01:44:34  17  they assert that a claim element is a software limitation,

01:44:39  18  that they don't need to comply with the 3-1 patent rule.

01:44:43  19  They can claim that it's a software limitation.  They can

01:44:46  20  wait until 30 days after the source code production and

01:44:48  21  then supplement those particular elements, infringement

01:44:52  22  with respect to those particular elements.

01:44:54  23         Now, the Plaintiffs for the two patents -- and,

01:44:56  24  again, it's only two patents of the four that Textron is

01:44:59  25  claiming the source code is relevant to, the restricted

01:45:01  1  source code, and for those two patents, they have asserted

01:45:06  2  40 claims.  Each have, you know, about five subparts.  So

01:45:10  3  we're talking about 200 elements.  For none of those

01:45:17  4  elements has Textron identified them being software

01:45:20  5  limitations, zero.

01:45:21  6          They did full claim charts.  They relied on things

01:45:26  7  like manuals, on app documentation, documentation

01:45:30  8  concerning programming.  They relied on videos and

01:45:35  9  screenshots of how the drones fly.  And that is our

01:45:40  10  contention, Your Honor, that the patent claims can be

01:45:43  11  evaluated for purposes of infringement off of those other

01:45:48  12  documents and things that exist that have been produced in

01:45:52  13  response also to the 3-4(a) production, so schematics and

01:45:57  14  drawings and release notes and all of the source code that

01:46:00  15  can be produced.

01:46:01  16          But there is a lot of other information out there,

01:46:05  17  and we do not think that this source code is necessary for

01:46:09  18  the Plaintiffs to prove their case.

01:46:14  19          THE COURT:  Of course, you don't think they can

01:46:16  20  prove their case, right?

01:46:17  21          MS. NYARADY:  Well, they can try off of what they

01:46:19  22  have.

01:46:20  23          But, you know, Your Honor, to put it another way,

01:46:24  24  the patent in question has to do with how the drone moves

01:46:26  25  and how it flies.  What better evidence than how the drone

01:46:31  1  flies?

01:46:31  2      Going back to the source code is not the root of

01:46:34  3  all proof.  It's just not.  And they have manuals that talk

01:46:38  4  about what you can do with the drone, how you can fly it,

01:46:41  5  what directions it can go in, you know, things that it can

01:46:44  6  do.  And, of course, there'll be more discovery.  There'll

01:46:48  7  be depositions.  There'll be other things.

01:46:50  8      But they found it sufficient for their

01:46:52  9  infringement contentions to rely on, for example, videos of

01:46:55  10 how the drones fly.  I think that's very telling, Your

01:47:00  11 Honor.

01:47:00  12      THE COURT:  Well, I mean, obviously you know they

01:47:03  13 can't patent any drone that moves in a certain way.  They

01:47:09  14 can only patent whatever their invention was that caused it

01:47:15  15 to move in a certain way.

01:47:18  16      So I can understand the problem with trying to

01:47:24  17 prove infringement to the standard of proof without being

01:47:29  18 able to examine why the accused device does what it does,

01:47:37  19 but --

01:47:37  20      MS. NYARADY:  And Your --

01:47:39  21      THE COURT:  -- I will -- I'll ask them to respond

01:47:41  22 to that and to show me.

01:47:49  23      MS. NYARADY:  Your Honor, there was also a mention

01:47:52  24 in the briefing -- I just want to make sure we're being

01:47:56  25 clear on this -- of using the withheld code as a sword in

01:48:01   1   our non-infringement defense.  They said that twice.  They

01:48:04   2   then separately in the briefing regarding the underlying

01:48:10   3   protective order for this case, they said that we're going

01:48:12   4   to use it as a shield.  So they've claimed that we're going

01:48:15   5   to use it as a sword and a shield.

01:48:17   6          I don't know what that means.  They seem to be

01:48:20   7   implying that that happened in the prior case.  I just want

01:48:22   8   to make it clear for the Court, I don't understand how a

01:48:28   9   lack of source code can be used in that way, but we do not

01:48:31  10   intend to do anything improper to rely on source code that

01:48:36  11   we could not produce or make any inferences about, you

01:48:42  12   know, why the source code is in the case, obviously, if we

01:48:47  13   were not able to produce it.

01:48:49  14          So I don't know what that involves, but I wanted

01:48:51  15   to make sure that I say that clearly.

01:48:54  16          THE COURT:  What is the status of the Western

01:48:56  17   District case?

01:48:57  18          MS. NYARADY:  My understanding is that they are in

01:49:00  19   post-trial briefing at the moment.

01:49:04  20          THE COURT:  And what was the verdict?

01:49:05  21          MS. NYARADY:  I was not in that case, Your Honor,

01:49:10  22   but my understanding is that there was infringement of two

01:49:14  23   patents, and the patents were not found invalid.  Beyond

01:49:17  24   that, I don't -- obviously there was a damages award, and I

01:49:22  25   believe there was a willfulness finding.

01:49:25  1      But counsel for Textron was in both cases, so they

01:49:28  2  can correct me if I'm wrong on that.

01:49:30  3      THE COURT:  And the patents are different patents

01:49:32  4  than those asserted here?

01:49:33  5      MS. NYARADY:  Correct.

01:49:35  6      THE COURT:  Okay.  All right.

01:49:45  7      MS. NYARADY:  The last thing I'll say, Your Honor,

01:49:46  8  is there was some discussion in the briefing about what the

01:49:50  9  proper standard is here or what factors should be

01:49:55 10  evaluated.

01:49:55 11      We do not believe that the seven-factor test set

01:50:01 12  forth in Defendant -- or, sorry, Plaintiff's responsive

01:50:05 13  papers is applicable here.  Those are discretionary

01:50:11 14  factors.  The Supreme Court specifically said they weren't

01:50:14 15  laying out a test that must be followed.  And in cases in

01:50:17 16  this district and in the Fifth Circuit seem to not have

01:50:22 17  analyzed those factors.  Some other district -- some other

01:50:26 18  circuit courts have.

01:50:27 19      And so we did address that in a footnote.  But to

01:50:30 20  be clear, we don't think that's the right standard.  That

01:50:33 21  seems to be implied when there is -- there are two choices

01:50:35 22  of ways to proceed with discovery.

01:50:39 23      That's not the case here.  This is a simple

01:50:42 24  protective order motion related to the harm that would be

01:50:44 25  imposed on the Defendants for complying with U.S.

01:50:49  1    discovery.

01:50:50  2           But should the Court disagree and think that that

01:50:54  3    is the proper test, we still think that a protective order

01:50:58  4    should be granted here.  Again, we don't think that the

01:51:02  5    importance of the information requested rises to the level

01:51:06  6    of being necessary, and we don't think that showing has

01:51:13  7    been made.

01:51:13  8           The degree of specificity obviously we would -- we

01:51:16  9    understand that the spec -- the requests are specific.  The

01:51:21  10   origination, whether it was in the U.S., there's no dispute

01:51:24  11   here that this originated -- this material -- these

01:51:28  12   materials originated in China and have only been in China.

01:51:32  13          The availability of alternate means to get at the

01:51:37  14   discovery, as we said, there's schematics, there's drones,

01:51:40  15   there's manuals, and we continue to work with the

01:51:45  16   Plaintiffs on producing additional documents as requested.

01:51:49  17   You know, they've raised some issues that they want to see

01:51:52  18   different types of documents, and we're actively collecting

01:51:54  19   those and producing those.  So we are trying our very best

01:51:58  20   to make sure that there are available alternative means for

01:52:02  21   this discovery.

01:52:03  22          There's then a balancing of the interests, and,

01:52:07  23   obviously, China has said that this source code raises

01:52:10  24   national security issues.  And we don't dispute Plaintiff's

01:52:15  25   briefing that obviously there are IP concerns that are

01:52:19  1   relevant in the U.S.'s interests and the interests in

01:52:23  2   discovery -- in litigation.

01:52:26  3          On hardships, DJI obviously would face severe

01:52:30  4   criminal and/or civil sanctions should they produce this

01:52:35  5   source code without permission.  We think that favors --

01:52:38  6   that factor is very important and favors DJI.

01:52:42  7          And then the good faith of DJI, again, as I said,

01:52:47  8   DJI has tried repeatedly to get the source code released,

01:52:51  9   is willing to continue to try, is willing to work with the

01:52:54  10  Plaintiffs to try to release that source code.  And if and

01:53:00  11  when they get permission, they absolutely will produce it.

01:53:05  12          THE COURT:  All right.

01:53:06  13          MS. NYARADY:  Thank you, Your Honor.

01:53:07  14          THE COURT:  Thank you, Ms. Nyarady.

01:53:09  15          MR. RICH:  Good afternoon, Your Honor.  Harrison

01:53:19  16  Rich from Baker Botts on behalf of Plaintiff, Textron.

01:53:21  17          Your Honor, Textron respectfully requests that the

01:53:25  18  Court deny DJI's motion.  DJI's strategy with this motion

01:53:29  19  is apparent.  It's using Chinese export control laws to get

01:53:34  20  a free pass on producing admittedly relevant source code.

01:53:38  21  And then DJI will use that lack of relevant source code as

01:53:42  22  a weapon to argue non-infringement.

01:53:44  23          THE COURT:  Mr. Rich --

01:53:46  24          MR. MEEK:  Yes.

01:53:46  25          THE COURT:  -- can you show me a claim element --

01:53:50  1   one of the asserted claims where it would be logical to

01:53:54  2   look to the source code?

01:54:05  3        MR. RICH:  Yes, Your Honor.  This is U.S. Patent

01:54:08  4   8,332,002 (sic).

01:54:12  5        Can Your Honor see this okay?

01:54:12  6        THE COURT:  This is '082?

01:54:14  7        MR. RICH:  '082 patent.

01:54:17  8        THE COURT:  Right.

01:54:18  9        MR. RICH:  Okay.  And before I launch into this,

01:54:20 10   I'll say that DJI made this same argument in front of

01:54:25 11   Judge Gilliland in the West Texas on another flight control

01:54:29 12   law patent, and he rejected that argument finding that --

01:54:31 13   he found it unlikely that the infringement could be proven

01:54:34 14   through looking at the drones.

01:54:35 15        And now diving into Claim 1 here of the '082

01:54:41 16   patent, we see that it recites a control system with

01:54:44 17   various architectures and initialization command logic.

01:54:50 18   The initial -- if you go down to the wherein clauses,

01:54:53 19   wherein the initialization command logic selectively

01:54:56 20   activates the lateral control architecture for controlling

01:55:00 21   lateral motion and selectively activates the longitudinal

01:55:05 22   control architecture for controlling the longitudinal

01:55:07 23   motion.

01:55:08 24        And then these -- the following wherein clause is

01:55:11 25   that the control system uses the lateral control and

01:55:14   1   longitudinal control architectures to control speed

01:55:18   2   variations while the aircraft is maintaining a constant

01:55:22   3   vector.  These are software limitations.  We're talking

01:55:24   4   about logic and architectures within the code.  We're not

01:55:27   5   talking about how you can look at a drone and see it.

01:55:32   6          And that's what makes this case so much different

01:55:36   7   than the one from the Federal Circuit that they cited, the

01:55:37   8   Cochran case, where it was about a scuba device.  We're not

01:55:41   9   talking about a scuba device.  We're talking about the

01:55:44   10  control system and how the control laws within that system

01:55:46   11  are programmed and how they are working to control the

01:55:49   12  drone.

01:55:55   13         THE COURT:  And you have or your side has reviewed

01:55:58   14  a lot of source code already in this case.

01:56:02   15         Are you representing that the source code that

01:56:04   16  you've reviewed is not the source code that performs these

01:56:08   17  functions in the accused device?

01:56:11   18         MR. MEEK:  Your Honor, last week, the -- DJI

01:56:15   19  filed a correction to its briefing that they did not

01:56:18   20  actually produce a vast amount of source code.  And so the

01:56:22   21  source code that we have reviewed is very sparse.  We

01:56:25   22  submitted a declaration from our code reviewer to that

01:56:29   23  point.

01:56:30   24         And my understanding is that there is no -- or at

01:56:34   25  least very minimal flight control code that's been

01:56:37  1  produced.

01:56:45  2        THE COURT:  All right.  And help me understand --

01:56:47  3  and this is a point that defense counsel inquired about

01:56:51  4  too, your concern that the absence of the source code would

01:56:56  5  be used as a sword for non-infringement.

01:56:58  6        MR. RICH:  Sure.

01:57:05  7        In the West Texas case, there were two main

01:57:08  8  arguments they made.  The first one was we had a patent

01:57:12  9  that said you hold speed, and that's what's important to

01:57:17  10  know for this argument.  The patent says hold speed.

01:57:20  11  They're arguing non-infringement based on holding position.

01:57:25  12  They say, we hold position, not speed.

01:57:27  13        And I want to show you a trial transcript where I

01:57:31  14  crossed their infringement -- non-infringement expert.  And

01:57:35  15  I'm going to flip through this.

01:57:45  16        Can Your Honor see this okay?

01:57:47  17        THE COURT:  Oh, yes.

01:57:48  18        MR. RICH:  Okay.  So what happened at trial, I'll

01:57:50  19  give you a little bit more context here, is what you'll

01:57:53  20  ultimately see in this transcript is they produced a

01:57:56  21  position control file, but they withhold velocity control.

01:58:01  22  So they're saying, we don't speed, we do position, but they

01:58:04  23  withheld the speed control file.

01:58:06  24        And so I asked their expert:  When you were asked

01:58:10  25  yesterday how you knew drones are holding a position, you

01:58:14  1  pulled up a source code file, didn't you?

01:58:16  2          And he says:  I did.

01:58:19  3          And you showed a function name "horizontal

01:58:24  4  position control."  Do you remember that?

01:58:26  5          I do.

01:58:27  6          But you left out something important.  You're

01:58:31  7  aware that one of the files that DJI withheld in this case

01:58:35  8  is called horizontal velocity control.

01:58:38  9          And he says:  Okay.

01:58:39  10          And so they centered their argument around a file

01:58:39  11  that was withheld, and they centered their argument on how

01:58:44  12  the product works on the thing they produced.

01:58:50  13          And so I ultimately asked him if he thought it was

01:58:52  14  fair to be saying that DJI only holds position when they

01:58:53  15  didn't give us the velocity control file.

01:59:00  16          And ultimately, he, evades a bit here and says

01:59:03  17  that the file names don't really mean anything.

01:59:10  18          And so I think this is the tactic that they're

01:59:13  19  going to take is they're going to produce some code and

01:59:16  20  say, this is how it works, but there -- there is other

01:59:20  21  highly relevant code that they've already admitted is

01:59:22  22  relevant that will go to infringement.

01:59:25  23          And in this scenario, I don't see how they can

01:59:27  24  produce a file called position control and withhold

01:59:31  25  velocity control under the guise of Chinese export control.

01:59:39  1          THE COURT:  The Defense contends that you have

01:59:43  2   turned down opportunities or requests to assist in drafting

01:59:49  3   the request to the Chinese authorities.

01:59:53  4          What is the thinking behind that?

01:59:55  5          MR. RICH:  I don't have a specific recollection of

01:59:57  6   actually being asked to be involved in drafting the

02:00:00  7   application other than when we first told them to go submit

02:00:04  8   an application, counsel told us, you're the ones that

02:00:07  9   actually have to file it, and we said, that wasn't right,

02:00:09 10   and ultimately they flipped that and said that they would

02:00:12 11   go file the application.

02:00:16 12          We pointed out several deficiencies in the

02:00:19 13   application from the West Texas case and understood that

02:00:23 14   those would be resolved.  However, we don't think they were

02:00:26 15   resolved.

02:00:28 16          If you looked at our briefing, they represented

02:00:30 17   that they would make the protective order a significant

02:00:33 18   component of their submission.  But what did they do?  They

02:00:39 19   actually did not include it until one business day before

02:00:43 20   China denied their application.

02:00:51 21          And when they submitted their reply brief, they

02:00:53 22   submitted a declaration from a DJI employee, and all it was

02:00:57 23   was about one sentence that said, we submitted the

02:00:59 24   protective order a couple days ago.

02:01:02 25          There was no indication of what they submitted

02:01:04   1   with the protective order, whether there was any

02:01:06   2   negotiations or explanation of the protective order,

02:01:09   3   nothing.

02:01:12   4       And if you look at Chinese -- the China -- China's

02:01:15   5   denial of the export application, it doesn't even reference

02:01:19   6   the protective order, so there's no indication it was ever

02:01:22   7   seriously considered.

02:01:25   8       THE COURT:  Does your Chinese counsel advise you

02:01:27   9   that this is a highly unusual thing or anything else

02:01:33  10   relevant about the way these regulations are normally

02:01:38  11   handled?

02:01:39  12       MR. RICH:  Your Honor, I was a little bit

02:01:44  13   surprised to hear that we have Chinese counsel.  That's not

02:01:47  14   something we have.

02:01:47  15       THE COURT:  All right.  Tell me about their --

02:01:53  16   they offer that you could inspect the source code if you

02:02:00  17   have a Chinese national expert even if it's someone who

02:02:07  18   ordinarily resides in this country.

02:02:09  19       Is that an avenue that Textron has explored?

02:02:12  20       MR. RICH:  We considered it, but, Your Honor, if

02:02:16  21   you looked at what they were saying was you could have

02:02:19  22   somebody go over there and look at the relevance of that

02:02:21  23   code and report back.  In other words, check the box, see

02:02:23  24   if it's relevant, and we'll go from there.

02:02:25  25       But they had already represented that the code was

02:02:28   1   relevant in the letter that we submitted with the briefing.

02:02:34   2   So it didn't move the ball forward because that person

02:02:38   3   couldn't tell us anything about the substance of what was

02:02:40   4   in the code, and we couldn't use it in this case other than

02:02:43   5   to look at relevance.

02:02:45   6            THE COURT:  I see.  What remedy does Textron

02:03:01   7   intend to pursue if this protective order is not granted?

02:03:05   8            MR. RICH:  Your Honor, of course, first, we need

02:03:07   9   to have the motion denied so that we can pursue a remedy

02:03:10  10   under Rule 37, and we will proceed to briefing on that.

02:03:13  11            We think the baseline ought to be what

02:03:16  12   Judge Albright did in the West Texas case where there was

02:03:20  13   an adverse inference that the withheld code would be

02:03:24  14   favorable to the infringement case on the patent that the

02:03:26  15   code was relevant to.

02:03:28  16            THE COURT:  So not that a particular element would

02:03:33  17   be deemed satisfied but rather just an adverse inference?

02:03:37  18            MR. RICH:  I think that would be a starting point,

02:03:39  19   Your Honor.  But we do need to talk more seriously because

02:03:41  20   they tried to undermine that inference in the trial by

02:03:45  21   arguing that the code wasn't relevant, and, for example,

02:03:49  22   the line of questioning I had to do that I showed

02:03:52  23   Your Honor.

02:03:53  24            So I think we need to start from the baseline of

02:03:56  25   that type of inference and consider whether something more

02:03:59  1   is needed to guard against arguments like the code isn't

02:04:03  2   relevant, and you should disregard the inference.

02:04:16  3          THE COURT:  Other than to have provided the

02:04:18  4   current protective order earlier in the process along with

02:04:22  5   the application itself, what other criticism do you have of

02:04:28  6   the application that DJI made in this case?

02:04:31  7          MR. RICH:  Well, I think they did not -- and we

02:04:35  8   told them about this.  The original application in our view

02:04:39  9   poisoned the well to where China was never going to reverse

02:04:42  10  course, and when I say original application, I'm talking

02:04:45  11  about the West Texas application.  Once that was done, we

02:04:48  12  think it was a done deal.

02:04:51  13         And we told them that because of the

02:04:53  14  misrepresentations to China in the West Texas application

02:04:57  15  about who would get the code, they needed to go tell China

02:05:01  16  that there were misrepresentations made and that they were

02:05:04  17  now correcting the record as they did here.  And they

02:05:09  18  didn't do that.

02:05:10  19         And so we think that China was -- it was very

02:05:12  20  difficult to get them to reverse course once they thought

02:05:17  21  that an American defense contractor would get possession of

02:05:23  22  the source code.

02:05:23  23         And obviously the protective order in our mind is

02:05:26  24  a big one when they said it's going to be a significant

02:05:28  25  part of the submission, and it wasn't even submitted until

| 02:05:31 | 1 | the business day before.  I think they could have explained |
| 02:05:34 | 2 | what was in the protective order and better explained how |
| 02:05:36 | 3 | that was going to guard against the code. |
| 02:05:41 | 4 | And I do want to show the Court one more thing |
| 02:05:46 | 5 | here because this, I think, came up on the opening argument |
| 02:05:49 | 6 | here.  DJI actually checked the box that this technology is |
| 02:05:56 | 7 | not a Chinese state secret technology.  I've got a couple |
| 02:06:00 | 8 | of stars down here, Your Honor.  And so I was -- I don't |
| 02:06:06 | 9 | think China has an interest in guarding this as a state |
| 02:06:10 | 10 | secret because DJI is saying it's not, and DJI also checked |
| 02:06:14 | 11 | the box, whether it has military use, checked no. |
| 02:06:19 | 12 | And so this is a commercial -- according to this |
| 02:06:23 | 13 | application, a commercial product.  And so I'm not seeing a |
| 02:06:27 | 14 | strong China interest in protecting it. |
| 02:06:30 | 15 | THE COURT:  I see two checks in that box involving |
| 02:06:34 | 16 | military use. |
| 02:06:36 | 17 | MR. RICH:  The "no" is highlighted bold, and so I |
| 02:06:39 | 18 | interpret that as no. |
| 02:06:40 | 19 | THE COURT:  All right. |
| 02:06:41 | 20 | MR. RICH:  Same with state secret, which I think |
| 02:06:43 | 21 | would be consistent with viewing this as a no. |
| 02:06:48 | 22 | THE COURT:  All right. |
| 02:06:58 | 23 | MR. RICH:  I do want to touch on -- Your Honor, |
| 02:07:00 | 24 | just very briefly, I want to touch on Judge Schroeder's |
| 02:07:04 | 25 | opinion from last week on the parties' disputed protective |

02:07:07   1    order provisions.  That opinion in our view effectively

02:07:12   2    decided the issue against DJI.  Your Honor may recall that

02:07:15   3    DJI pursued some pretty strong source code protections

02:07:18   4    through the joint motion on a protective order.  That was

02:07:21   5    Docket 41.

02:07:23   6         One of the provisions that DJI pursued was in

02:07:27   7    Paragraph 16 of their proposal.  And I've highlighted the

02:07:31   8    relevant language yellow here, and I'll read that into the

02:07:34   9    record.  The provision they asked for:  Without license or

02:07:40   10   permission from Chinese competent government, no protected

02:07:46   11   material, which would include source code, may leave the

02:07:48   12   territorial boundaries of Chinese mainland or be made

02:07:51   13   available to any person who is not a national to PRC or

02:07:56   14   lawfully admitted for permanent residence in Chinese

02:07:59   15   mainland.

02:08:00   16        So we briefed that issue.  That's exactly what

02:08:03   17   they're pursuing here.  We briefed that issue, and the

02:08:06   18   Court resolved it against DJI.  We briefed it again when

02:08:09   19   DJI objected to the Court's order.  But last week, Judge

02:08:12   20   Schroeder found no error in the Court rejecting that

02:08:15   21   provision.

02:08:15   22        And the relief DJI is seeking here is not any

02:08:18   23   different because DJI's proposed order is that it doesn't

02:08:20   24   have to produce the code unless and until China grants a

02:08:25   25   license.  And that's exactly what Paragraph 16 was trying

02:08:28  1   to do.  DJI is making the same types of arguments, and the

02:08:32  2   Court already rejected them.  There's no reason to depart

02:08:36  3   from the Court's prior ruling here.

02:08:44  4        Your Honor, on the argument about, well, Textron

02:08:46  5   doesn't need the code because there's other discovery, I

02:08:50  6   want to point out a couple things.  First, I think it's a

02:08:53  7   logical sleight-of-hand.  If DJI can't produce the code

02:08:57  8   because they say it's restricted, then they also have

02:09:00  9   documents that if they explain how the code works, those

02:09:03  10  aren't getting out.

02:09:07  11        It's also to me a very hollow argument.  We

02:09:09  12  pointed out in the briefing that they haven't identified a

02:09:13  13  single document in the briefing that would show how the

02:09:15  14  product works other than the code.

02:09:18  15        Of course, they said they produced the vast amount

02:09:24  16  of code, and we showed that that was inaccurate.

02:09:27  17        And then this argument about necessity.  Necessity

02:09:30  18  is not the standard.  The Aerospatiale standard is the

02:09:35  19  standard, and that's the importance of the withheld

02:09:37  20  material.  Their own cases -- and, in fact, they were the

02:09:39  21  ones that first cited that standard in their opening brief

02:09:42  22  in a footnote.  And their own cases actually go through the

02:09:48  23  Aerospatiale factors.

02:09:51  24        DJI argued that it faces criminal penalties if it

02:09:54  25  produced the code.  Again, DJI argued that on this

02:10:01   1   Paragraph 16 protective order dispute.  And Judge Schroeder

02:10:03   2   and this Court did not find it persuasive.

02:10:06   3           We cited, Your Honor, the In re Valsartan case,

02:10:11   4   and I think that logical applies very strongly here.  PRC

02:10:14   5   Defendants cannot enter the U.S. market expecting a shield

02:10:15   6   from unfavorable discovery by blocking statutes.  If you

02:10:19   7   don't like the rules, that Court said, then stop doing

02:10:23   8   business here.

02:10:24   9           DJI is the world's largest drone maker and does

02:10:28   10   billions in business here.  They chose to do business here,

02:10:30   11   and they should play by the rules.

02:10:32   12           There's actually no cited evidence from DJI that

02:10:36   13   this law is even enforced against company like DJI.  DJI is

02:10:43   14   a Chinese behemoth, and our government has identified them

02:10:48   15   as a Chinese military company, so it makes little sense to

02:10:53   16   enforce a law that they're citing against a company like

02:10:56   17   that.

02:10:56   18           DJI in their argument said that it's a limited

02:11:00   19   amount of code, but, again, it's the flight control code.

02:11:03   20   Our expert in the declaration tied all the withheld modules

02:11:09   21   to the claims.  It's highly important information.

02:11:12   22           THE COURT:  All right.

02:11:14   23           MR. RICH:  Thank you, Your Honor.

02:11:14   24           THE COURT:  Thank you, Mr. Rich.

02:11:27   25           MS. NYARADY:  So, Your Honor, during the meet and

02:11:29  1   confer that we had on May 23rd, Textron's counsel did say

02:11:33  2   that they consulted with individuals in China, and it may

02:11:37  3   be that I assumed they were attorneys.  So I apologize if

02:11:40  4   that's not accurate.

02:11:40  5        But they represented that they had been looking

02:11:43  6   into these issues, you know, in parallel.

02:11:47  7        With respect to the vast amount of source code,

02:11:54  8   which counsel has said that we admitted we did not produce,

02:11:59  9   I don't think that accurately reflects the declaration that

02:12:01  10  was submitted.  There were, in fact, you know, well over

02:12:06  11  1.5 million lines of code.  It took their expert over four

02:12:09  12  days to go through the code that was there.  And to be

02:12:14  13  clear, not all of the flight control code is part of the

02:12:17  14  restricted code.  It's certain modules.

02:12:21  15       And so, again, we do not believe -- and even the

02:12:26  16  parts that were put up on the screen, we don't believe that

02:12:28  17  those elements need source code to be addressed.  They were

02:12:33  18  addressed in the infringement contentions without it.  And

02:12:36  19  the declarations from the expert -- separate from attorney

02:12:38  20  argument, the declaration from the expert limited his

02:12:42  21  findings to relevance.  We briefed the entire motion saying

02:12:45  22  that we believed the proper standard was necessity, that we

02:12:50  23  believed that there needed to be a showing that they needed

02:12:53  24  this source code.

02:12:56  25       And this, Your Honor, comes from cases within this

02:12:59  1   circuit.  The MI case in the Southern District did not use

02:13:03  2   the seven-factor case.  The Cunningham case from the

02:13:06  3   Eastern District of Texas did not.  The Arigna case from

02:13:12  4   the Eastern District did not address these factors.

02:13:15  5        So we stand by the fact that we think the proper

02:13:18  6   test for a protective order is whether it has been shown

02:13:22  7   that it will be oppressive and an undue burden to produce,

02:13:27  8   and then the burden shifts to Textron to show that it's

02:13:30  9   necessary and that any harm is outweighed by the need for

02:13:35  10  the discovery.

02:13:37  11       And so when he points to things like, you know,

02:13:41  12  position control and velocity control, again, I come back

02:13:44  13  to those are things that are readily observable, and

02:13:48  14  there's been no showing that figuring out exactly how that

02:13:52  15  works is necessary, and certainly none by the expert.

02:13:55  16       THE COURT:  When the claim element is control

02:14:02  17  logic, how can that be anything but code?

02:14:05  18       MS. NYARADY:  Well, if you have architecture

02:14:07  19  documents and documents that describe schematics that talk

02:14:11  20  about how the system works and how the pieces talk to each

02:14:13  21  other, that could be described in words.  That could be

02:14:16  22  described in documents.

02:14:17  23       THE COURT:  And has that been done?  Have they

02:14:20  24  been given architecture that it describes in words

02:14:23  25  everything that's in the code?

02:14:24    1          MS. NYARADY:  We believe that they were given

02:14:27    2    documents sufficient to show the operations.  There is --

02:14:30    3    there have been meet and confers on this.  They have --

02:14:35    4    Baker Botts and Textron has disputed that we have produced

02:14:38    5    enough in terms of the 3-4(a) production with respect to

02:14:43    6    schematics and other documents, and they've identified

02:14:45    7    certain documents that they wanted us to go back and look

02:14:48    8    for, and we've been doing that, and we've been producing

02:14:51    9    more documents on a rolling basis, and if they raise other

02:14:54   10    issues, we will keep looking for the right documents and

02:14:59   11    what they need.

02:15:00   12          THE COURT:  All right.

02:15:00   13          MS. NYARADY:  But we do not believe that the only

02:15:03   14    way at this is the source code.

02:15:05   15          THE COURT:  Well, at this point, I'm not satisfied

02:15:09   16    that DJI has used its best efforts to get the regulatory

02:15:19   17    approval.  There -- the Plaintiff points out that there

02:15:25   18    were errors in the first application made in the Western

02:15:27   19    District that have not been squarely confronted.  There was

02:15:31   20    also the fact that the application here omitted the

02:15:37   21    protective order, which is a fairly crucial thing until the

02:15:41   22    day before the decision.

02:15:42   23          I'm going to deny the motion for protective order

02:15:48   24    at this time.  But there won't be a decision made about

02:15:52   25    what remedy the Plaintiff is entitled to until we get a lot

02:15:58  1   further down the road.  And before any remedy is decided

02:16:04  2   on, the Defendant will have had the opportunity to see

02:16:07  3   whether that source code can be obtained through additional

02:16:13  4   efforts, and the Plaintiff will be put to the task of

02:16:16  5   showing what the effect has been of the failure to produce

02:16:24  6   the source code, and with that information an appropriate

02:16:31  7   remedy can be crafted.

02:16:32  8           But I do not believe that at this point the

02:16:37  9   Defendant has shown entitlement to a decision that it has

02:16:43  10  done everything it can and is not in default.

02:16:51  11          So at this point, it is denied, but that does not

02:16:57  12  mean that any -- it does not dictate what the remedy will

02:17:02  13  be.  I think there's a vast array, and I'll leave that for

02:17:07  14  the future.

02:17:10  15          MS. NYARADY:  Thank you, Your Honor.

02:17:11  16          THE COURT:  Anything else, Ms. Nyarady, that your

02:17:13  17  side needs?

02:17:14  18          MS. NYARADY:  Not from me, Your Honor.

02:17:15  19          THE COURT:  All right.  Mr. Rich?

02:17:21  20          MR. RICH:  We are having some issues on other

02:17:23  21  discovery that we'll meet and confer about, and I think we

02:17:26  22  are going to try to do one very briefly after this.  So we

02:17:30  23  may be back before the Court very soon.

02:17:33  24          THE COURT:  I'll be here.

02:17:33  25          MR. RICH:  Thank you, Your Honor.

02:17:36  1            THE COURT:  All right.  Thank you.

02:17:37  2            And we'll be in recess until the next matter is

02:17:39  3  ready to resume.  Thank you.

02:17:41  4            COURT SECURITY OFFICER:  All rise.

02:17:43  5            (Hearing concluded at 2:17 p.m.)

          6

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

1                        CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7


8


9    /S/ Shelly Holmes                    7/26/2023
     SHELLY HOLMES, CSR, TCRR             Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2023

12

13

14

15

16

17

18

19

20

21

22

23

24

25